IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LISA STAMM, and<br>VANESSA HUMARAN,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF CHEYENNE,<br>NEBRASKA, acting through the<br>Cheyenne County Sheriff's<br>Department;<br>JOHN JENSON, acting in his<br>individual and official capacities;<br>CITY OF SCOTTSBLUFF,<br>NEBRASKA, acting through the City<br>of Scottsbluff Police Department;<br>KEVIN SPENCER, acting in his<br>individual and official capacities;<br>COUNTY OF SCOTTS BLUFF,<br>NEBRASKA, acting through the<br>Scotts Bluff County Sheriff's<br>Department; and<br>MARK OVERMAN, in his individual<br>and official capacities,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 4:17CV3146<br><br><br>MEMORANDUM<br>AND ORDER |

This matter is before the court on Defendants' motions to dismiss Plaintiffs' Amended Complaint (Filing Nos. 25, 27), which will be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Also at issue are two motions that were filed by Plaintiffs in response to Defendants' motions: (1) Plaintiffs' unopposed motion to dismiss two counts of the Amended Complaint (Filing No. 33), which will be granted; and (2) Plaintiffs' motion to file evidence under restricted access (Filing No. 39), which will be denied.

# I. INTRODUCTION

Plaintiffs, Lisa Stamm ("Stamm") and Vanessa Humaran ("Humaran"), are employed by the Nebraska Crime Commission ("Commission"),[1] which is not a party to this action. Named as Defendants are the Sheriff of Cheyenne County, Nebraska, John Jenson ("Jenson"), the Chief of Police of the City of Scottsbluff, Nebraska, Kevin Spencer ("Spencer"), and the Sheriff of Scotts Bluff County, Nebraska, Mark Overman ("Overman"), together with the political subdivisions they each represent.

Humaran claims her personal information stored on the Nebraska Criminal Justice Information System ("NCJIS"), which is maintained by the Commission, was illegally accessed by Spencer in June and September 2016, and was then unlawfully distributed to Jenson and Overman, to other employees or officials of their political subdivisions, and possibly to law enforcement agencies in other counties in western Nebraska (Amended Complaint [Filing No. 24], ¶¶ 22, 25). Similarly, Stamm claims her personal information on NCJIS was illegally accessed by Jenson in June 2017 and then unlawfully disseminated (Amended Complaint, ¶¶ 31, 33).

Stamm also claims that Overman and Spencer filed frivolous written complaints with the Nebraska Attorney General about Stamm's private postings on Facebook regarding the use of medicinal marijuana, and she alleges on information and belief that her Facebook account was illegally accessed (Amended Complaint, ¶ 27). In addition, Stamm alleges on information and belief that one or more Defendants made "harassing, threatening and intimidating" telephone calls to her during July and August 2017, calling her a "cop hater" and telling her to "quit putting dead babies on the highway." (Amended Complaint, ¶ 30) She also alleges upon information and

---

[1] The Commission is officially known as the Nebraska Commission on Law Enforcement and Criminal Justice. Neb. Rev. Stat. § 81-1415. Its consists of nineteen members, including the Governor and the Attorney General; most of the members are gubernatorial appointees. *See* Neb. Rev. Stat. § 81-1417.

belief that one or more Defendants used unlawful means to obtain her private telephone number (Amended Complaint, ¶ 30).

The NCJIS searches on Humaran were conducted "shortly after" she assumed some of the duties of administering the Justice Assistant Grant ("JAG"), which for approximately 25 years had provided funding for the Western Intelligence Narcotic Group ("WING"), a drug task force comprised of law enforcement agencies located in the Nebraska panhandle. Participating agencies included the Scottsbluff Police Department and the Cheyenne County and Scotts Bluff County Sheriff's Departments (Amended Complaint, ¶¶ 16, 17, 24). JAG funding for the WING program was discontinued in May 2017 (Amended Complaint, ¶ 15).

Sometime during 2016, Humaran was "a member of the JAG strategic planning group, attend[ed] JAG meetings, and participat[ed] in the staff review group that made recommendations for funding JAG programs such as the WING program." (Amended Complaint, ¶ 13) Humaran does not allege that she actually played any role in making a funding recommendation for the WING program, but she claims the NCJIS searches Defendant Spencer performed in June and September 2016 were done "for the sole purpose of harassing and intimidating [her]." (Amended Complaint, ¶ 24) However, there are no facts alleged to indicate in what manner she was harassed or intimidated by the searches. Humaran states that "at all time alleged" she was the Juvenile Justice Administrator for the Commission, but also alleges that in 2017 she became the Assistant Grant Administrator (Amended Complaint, ¶ 13). Again, there are no facts alleged to show that she actually played any part in discontinuing JAG funding for the WING program in her capacity as Assistant Grant Administrator, or, for that matter, that she was subjected to any allegedly unlawful conduct during 2017.

Stamm "at all time alleged" was the Grants Division Chief for the Commission, and her duties "also included administering the Justice Assistance Grant which is funded through the U.S. Department of Justice." (Amended Complaint, ¶ 12) There is no indication of what role, if any, Stamm played in the discontinuance of JAG

funding for the WING program, but it is alleged that "[f]ollowing the defunding of the WING grant in May, 2017 due to their egregious and habitual non-compliance, Plaintiff Stamm has been subjected to unlawful, intimidating, threatening, and harassing conduct by the Defendants," including the complaints made to the Attorney General about her private Facebook postings and the telephone calls she received in July and August 2017 (Amended Complaint, ¶ 26).

Both Plaintiffs also assert a gender-based equal protection claim against all Defendants, alleging that "[m]ale members of the Nebraska Crime Commission ... who worked with the Defendants on their unsuccessful grant application, ... [or] who voted to deny the WING grant were not subjected to unlawful NCJIS searches or the other unlawful actions." (Amended Complaint, ¶¶ 35, 52) It is further claimed that "due to the Plaintiffs' gender (female), Defendants Jenson, Spencer and Overman by and through a mutual understanding and meeting of the minds, sought to deprive the female Plaintiffs equal protections under the law through their conspiracy and together they conspired to prevent by force, intimidation, or threat the Plaintiffs from discharging their duties and/or hindering, impeding or interrupting their official duties and/or conspiring to deprive Plaintiffs of their statutorily and constitutionally protected rights to equal protection, equal privileges, immunities, free speech (Stamm only), privacy, liberty, and against unlawful search and seizure in violation of 42 U.S.C. §1985." (Amended Complaint, ¶ 34) In addition, a section 1983 conspiracy claim is asserted against all Defendants (Amended Complaint, ¶¶ 39, 58).

Plaintiffs' Amended Complaint contains a total of ten claims (or counts), seven of which are alleged by both Plaintiffs against all Defendants:

- Defendants have violated Plaintiffs' constitutional and statutory right to privacy in contradiction of the Constitutions of the State of Nebraska (Art. 1, § 3), the United States of America (14th Amendment) and 42 U.S.C. § 1983. (Count 1 of Amended Complaint, ¶ 43)

- Defendants have violated Plaintiffs' constitutional and statutory right to Equal Protection under the laws in contradiction of the Constitutions of the State of

Nebraska (Art. 1, § 1), the United States of America (14th Amendment) and 42 U.S.C. § 1983. (Count 4 of Amended Complaint, ¶ 52)

- Defendants have violated Plaintiffs' constitutional right to liberty in contradiction of the Constitutions of the State of Nebraska (Art. 1, § 1), the United States of America (14th Amendment) and 42 U.S.C. § 1983. (Count 5 of Amended Complaint, ¶ 55)

- Defendants have engaged in a conspiracy to violate the Plaintiffs' constitutional and statutorily protected rights in contradiction of the Constitutions of the State of Nebraska, the United States of America, and 42 U.S.C. § 1983. (Count 6 of Amended Complaint, ¶ 58)

- Defendants have engaged in a conspiracy to violate the Plaintiffs' constitutional and statutorily protected rights of the Plaintiffs in contradiction to 42 U.S.C. § 1985. (Count 7 of Amended Complaint, ¶ 61)

- Defendants have violated Plaintiffs' rights arising under Neb. Rev. Stat. §§ 28-924, 28-925, 28-926, 29-3518 and 42 U.S.C. § 1983. (Count 8 of Amended Complaint, ¶ 64)

- Defendants have conspired to violate Plaintiff's [*sic*] rights arising under Neb. Rev. Stat. §§ 28-924, 28-925, 28-926, 29-3518 and 42 U.S.C. § 1983." (Count 9 of Amended Complaint, ¶ 67)

Plaintiffs have filed a motion to dismiss the last two claims (Counts 8 and 9), which allege Defendants violated state statutes that limit use of the NCJIS database.

Two claims are alleged only by Plaintiff Stamm. One of these claims is alleged only against Defendants Jenson and Cheyenne County, while the other is alleged against all Defendants:

- Defendants Jenson and Cheyenne County, Nebraska, violated Plaintiff Stamm's constitutional and statutory right against unlawful search and seizure in contradiction of the Constitutions of the State of Nebraska (Art. 1, § 7), the United States of America (4th Amendment) and 42 U.S.C. § 1983. (Count 2 of Amended Complaint, ¶ 46)

- Defendants have violated Plaintiff Stamm's right to free speech in contradiction of the Constitutions of the State of Nebraska (Art. 1, § 1), the United States of America (1st Amendment) and 42 U.S.C. § 1983. (Count 10 of Amended Complaint, ¶ 70)

The final claim is alleged by Plaintiff Humaran against Defendants Spencer and the City of Scottsbluff:

- Defendants Spencer and the City of Scottsbluff, Nebraska violated Plaintiff Humaran's constitutional and statutory right against unlawful search and seizure in contradiction of the Constitutions of the State of Nebraska (Art. 1, § 7), the United States of America (4th Amendment) and 42 U.S.C. § 1983. (Count 3 of Amended Complaint. ¶ 49)

## II. DISCUSSION

This action originated in the District Court of Lancaster County, Nebraska, and was removed to this court by Defendants on November 2, 2017. The notice of removal states that the action "contains only federal civil rights causes of action asserted under 42 U.S.C. §1983 and 42 U.S.C. §1985," and that the court "has original jurisdiction over the action under 28 U.S.C. § 1331." (Filing No. 1, ¶¶ 1, 4)

As outlined above, however, Plaintiffs also allege that Defendants violated various provisions of the Nebraska Constitution.[2] A plaintiff may not bring a state claim under the aegis of § 1983.[3] *See Preston v. City of Pleasant Hill*, 642 F.3d 646, 650 (8th Cir. 2011). Thus, the court does not have original jurisdiction over these state

---

[2] Counts 8 and 9 of the Amended Complaint, alleging violations of Nebraska statutes (and also Count 4, asserting an equal protection claim), were not included in the original Complaint.

[3] "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks and citation omitted).

constitutional claims under § 1331, but may only exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367. *See Preston*, 642 F.3d at 650.

Plaintiffs generally allege for their § 1985 claim (Count 7) that Defendants conspired to violate Plaintiffs' "constitutional and statutorily protected rights." To the extent Plaintiffs are attempting to rely upon provisions of the Nebraska Constitution or statutes, this conspiracy claim also fails as a matter of law. "To state a claim under the equal protection provisions of the first part of § 1985(3), ... [a plaintiff] must allege that an independent *federal* right has been infringed." *Federer v. Gephardt*, 363 F.3d 754, 757-58 (8th Cir. 2004) (emphasis supplied); *see also Nieto v. United Auto Workers Local 598*, 672 F. Supp. 987, 991 (E.D. Mich. 1987) (§ 1985(3) "has been interpreted as requiring a violation of federal law, whether federal statutory law or the Constitution."); *Weise v. Reisner*, 318 F. Supp. 580, 583 (E.D. Wis. 1970) ("§ 1985 runs only to a deprivation of the federal right to equal protection of the law or of equal privileges and immunities under the law.").

Returning to the state-law claims over which the court might be able to exercise supplemental jurisdiction, it is alleged in Counts 1, 2, 3, 4, 5, and 10 of the Amended Complaint that Defendants violated Plaintiffs' "constitutional and statutory right[s] ... in contradiction of the Constitution[ ] of the State of Nebraska ...." (Amended Complaint, ¶¶ 43, 46, 49, 52, 55, 70) Also, it is alleged in Count 6 of the Amended Complaint that "Defendants have engaged in a conspiracy to violate the Plaintiffs' constitutional and statutorily protected rights in contradiction of the Constitution[ ] of the State of Nebraska ...." (Amended Complaint, ¶ 58)

Even if the Nebraska constitutional provisions cited by Plaintiffs, Article I, §§ 1, 3, and 7, might be self-executing (an unresolved issue under Nebraska law),[4] the Nebraska Supreme Court has held that legislative action is necessary to waive the

_____

[4] The court also expresses no opinion as to whether Nebraska law permits the bringing of a conspiracy claim for alleged violations of the Nebraska Constitution.

state's sovereign immunity. *See McKenna v. Julian, 763 N.W.2d 384, 390-91 (Neb. 2009)* (finding it unnecessary determine whether due process and search and seizure provisions of Nebraska Constitution are self-executing because Political Subdivisions Tort Claim Act did not waive sovereign immunity for suit against city and police officer). Neb. Rev. Stat. § 20-148(1) authorizes the bringing of suit for "the deprivation of any rights, privileges, or immunities secured by the United States Constitution or the Constitution and laws of the State of Nebraska," but there is an express exception for political subdivisions.

"The statute clearly exempts political subdivisions and their employees from civil remedies for any deprivation of constitutional and statutory rights." *McCurry v. Swanson, No. 8:08CV448, 2009 WL 2969504, at \*3-4 (D. Neb. Sept. 8, 2009)* (citing *McKenna, 763 N.W.2d at 390-91*); *see McKenney v. Harrison, No. 8:09CV129, 2009 WL 1606458, at \*2 (D. Neb. June 3, 2009)* (finding it unnecessary to speculate about whether the Nebraska Supreme Court would consider Article I, §§ 3, 7, of the Nebraska Constitution to be self-executing because claims brought against city and its police officers who were alleged to be acting within the scope of their employment were barred by sovereign immunity, expressly preserved in Neb. Rev. Stat. § 20-148).[5] "Section 20-148 is a procedural statute designed to allow plaintiffs to bypass administrative procedures in discrimination actions against private employers; it does not operate to waive sovereign immunity and has no application here." *Potter v. Bd. of Regents of the Univ. of Nebraska, 844 N.W.2d 741, 749-50 (Neb. 2014)*.

Nebraska's sovereign immunity doctrine is a matter of substantive law, which this court must apply in exercising supplemental jurisdiction. *See Montin v. Moore, 846 F.3d 289, 293 (8th Cir. 2017)* (holding district court did not err in dismissing medical malpractice claim without prejudice because State Tort Claim Act's waiver

---

[5] Sheriff Jenson, Sheriff Overman, and Chief Spencer are all alleged to have been acting within the scope of their employment when they deprived Plaintiffs of their rights under the Nebraska Constitution. (Amended Complaint, ¶ 9.)

of immunity required suit to be filed in state court). The Nebraska Supreme Court has held that a trial court lacks subject matter jurisdiction over an action against the state unless the state has consented to suit, and that lack of subject matter jurisdiction may be raised at any time by any party or by the court *sua sponte*. *Davis v. State*, 902 N.W.2d 165, 186 (Neb. 2017). "Even in the absence of a challenge from any party, [federal] courts have an independent obligation to determine whether subject matter jurisdiction exists." *Sac & Fox Tribe of the Mississippi in Iowa, Election Bd. v. Bureau of Indian Affairs*, 439 F.3d 832, 836 (8th Cir. 2006). And "[i]f the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

Thus, even though Defendants have not expressly raised the issue of sovereign immunity,[6] the court concludes that lacks subject matter jurisdiction over all state-law claims alleged by Plaintiffs (as contained within Counts 1, 2, 3, 4, 5, 6, and 10 of the Amended Complaint), and will therefore dismiss such claims without prejudice. Alternatively, because the court has determined that all federal law claims should be dismissed, these state-law claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(3).

Consequently, in the discussion which follows, Counts 1, 2, 3, 4, 5, 6, and 10 of the Amended Complaint will be analyzed solely with reference to alleged deprivations of Plaintiffs' federal constitutional rights. Analysis of the § 1985 conspiracy claim (Count 7) will also be limited to the United States Constitution. These federal claims will be discussed in the following order: Plaintiffs' separate

---

[6] The motion to dismiss filed by Cheyenne County, Sheriff Jenson, Scotts Bluff County, and Sheriff Overman (Filing No. 25) is made pursuant to Federal Rule of Civil Procedure 12(b)(1) in addition to Rule 12(b)(6), but these Defendants only argue in their brief that Article III standing is lacking with respect to portions of the claims that are alleged by both Plaintiffs against all Defendants. As will be discussed later, the court does not view this as presenting a question of subject matter jurisdiction, but, rather, a pleading issue arising under Federal Rule of Civil Procedure 10(b).

Fourth Amendment claims of unlawful search and seizure (Counts 2 and 3); Plaintiffs' joint claims of alleged deprivations of their Fourteenth Amendment rights to privacy (Count 1), liberty (Count 5), and equal protection (Count 4); Plaintiff Stamm's First Amendment claim (Count 10); and, finally, Plaintiffs' joint claims of conspiracy (Counts 6 and 7). First, however, the court will take up Plaintiffs' motions.

### A. Plaintiffs' Motion to Dismiss

On March 6, 2018, after Defendants filed their motions to dismiss, Plaintiffs filed a motion stating that they "do not wish to prosecute Counts XIII [*sic*] and IX of the First Amended Complaint" and requesting the court to "enter an Order dismissing Counts XIII [*sic*] and IX of the First Amended Complaint." (Filing No. 32) It was also stated that Plaintiffs' counsel "has contacted attorneys for the Defendants and they have no objection to said motion." (*Id.*) An amended motion was filed later that same date, in which Plaintiffs stated that their previous filing "improperly referenced the counts to be dismissed" and that they are in fact seeking "to dismiss Counts VIII and IX of the First Amended Complaint." (Filing No. 33)[7] It was again represented that the motion "is unopposed by both defense counsel." (*Id.*)

"Although there exists some disagreement on whether a plaintiff must follow Fed. R. Civ. P. 15(a) or 41(a) when dismissing less than all of the claims involved in an action, [the Eighth Circuit] in *Johnston v. Cartwright*, 355 F.2d 32, 39 (8th Cir. 1966), recognized that the differences were more technical than substantial: '(I)t may not be material whether the court acts under Rule 15(a) which relates to amendments ... or Rule 41(a)(2).'" *Wilson v. Crouse-Hinds Co.*, 556 F.2d 870, 873 (8th Cir. 1977) (footnote omitted); *see also Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1141 n. 9 (8th Cir. 2014) (finding it unnecessary to decide whether plaintiff's attempt to dismiss only some of his claims, rather than the entire action, was governed

---

[7] To avoid further confusion, the court is referencing the Counts of Plaintiffs' Amended Complaint using Arabic numerals rather than Roman numerals.

by [Federal Rule of Civil Procedure 41(a)](). Any differences between [Rule 15(a)]() and [Rule 41(a)]() are not material in this case because Defendants do not object to Plaintiffs' motion.[8]

The court therefore will grant Plaintiffs' motion to dismiss, as amended, and will dismiss Counts 8 and 9 of Plaintiffs' Amended Complaint without prejudice. This will, of course, render moot those portions of Defendants' motions to dismiss that pertain to Counts 8 and 9.

### B. Plaintiffs' Motion to File Evidence Under Restricted Access

On April 5, 2018, Plaintiffs filed a motion "for an Order allowing Plaintiff Lisa Stamm to file newly obtained supplemental evidence" in response to Defendants' motions to dismiss, and, "[i]nsofar as the recently obtained evidence sought to be filed is highly sensitive, private, and confidential, ... to file it under restricted access." (Filing No. [39]()) The motion will be denied for noncompliance with local rules.

[Nebraska Civil Rule 5.3]() specifies that a party seeking to restrict access to documents must state in the motion "why redaction would not reduce or eliminate the need for restriction," and further provides that the document must be "filed separately as a restricted document." [NECivR 5.3]()(c)(1)(A) & (B).[9] "In ruling on the motion, the

---

[8] Had Defendants objected, the situation might be different because Plaintiffs' motion was filed more than 21 days after service of Defendants' first-filed motion to dismiss. Consequently, a court order is required for amendment. *See* [Fed. R. Civ. P. 15(a)(1)(B)](). In contrast, a voluntary dismissal can occur without a court order at any time prior to the filing of an answer or a motion for summary judgment. *See* [Fed. R. Civ. P. 41(a)(1)(A)(i)]().

[9] "When access to a document is restricted under the E-Government Act, an entry noting the restricted access appears on the public electronic docket sheet; however, only parties of record and court users may routinely access the document electronically. The public does not have remote access to the restricted document from

assigned judge may lift the restriction on the document, strike it, or order the filing party to place a redacted copy of the document on the public docket." NECivR 5.3(c)(2). Plaintiffs have not adequately explained in their motion or supporting brief why restriction is necessary, and, more importantly, they have not filed the documents with the court.

The court also denies the motion as untimely under Nebraska Civil Rule 7.1. "[A] motion is submitted on the briefs and any evidence filed when the time limit specified in Nebraska Civil Rule 7.1(c) expires." NECivR 7.1(f). Rule 7.1(c) provides that "[t]he moving party may file a reply brief and index of evidence within 7 days after the opposing party files and serves the opposing brief" and that "[n]o party may file further briefs or evidence without the court's leave." NECivR 7.1(c).

Plaintiffs indicate in the brief filed in support of the motion that the "newly obtained supplemental evidence" was "obtained on March 29, 2018" and it pertains to the claim that "Defendant Jenson, acting within the scope and course of his employment with Cheyenne County, conducted an illegal NCJIS search of Plaintiff Stamm on June 12, 2017." (Filing No. 40) They state that the evidence "will shed substantial light upon the nature and substance of the highly confidential and intimate information Jenson obtained on Stamm as a result of the illegal search" and "will further demonstrate that the information illegally obtained by Jenson was HIPPA [*sic*] protected." (*Id.*)

Defendants Jensen and Cheyenne County filed a reply brief in support of their motion to dismiss on March 9, 2018 (Filing No. 34), at which time the motion was placed under submission. While the court could grant Plaintiffs leave to file evidence after that date, Plaintiffs have failed to explain why the evidence could not have been

---

the docket sheet. The court may grant the public leave for remote access upon motion." NECivR 5.3(c)(3).

discovered earlier. Absent any such showing, the court finds no reason to deviate from its rules and standard procedures. *See* NEGenR 1.1(c).

Furthermore, even if the motion were timely, "a motion to dismiss under Rule 12(b)(6) tests only the sufficiency of the allegations in the complaint, not the sufficiency of the evidence offered to support those allegations." *Harrington v. Hall Cty. Bd. of Supervisors*, No. 4:15-CV-3052, 2016 WL 1274534, at *4 (D. Neb. Mar. 31, 2016). Accordingly, a court generally may not consider materials outside the pleadings when deciding a motion to dismiss for failure to state a claim.[10] *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir.1999) (noting exceptions). Most courts view "matters outside the pleading" as being any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for, and does not merely reiterate, what is said in the pleadings. *Gorog v. Best Buy Co.*, 760 F.3d 787, 791 (8th Cir.2014). From the limited description provided, Plaintiffs' "newly obtained supplemental evidence" appears to fall into this category.

### C. Defendants' Motions to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to

---

[10] While a district court has discretionary authority Under Rule 12(d) to consider matters outside the pleadings by treating a Rule 12(b)(6) motion as one for summary judgment, and to dispose of the motion under Rule 56, the Eighth Circuit has made it clear that "the district court may not force public officials into subsequent stages of district court litigation without first ruling on a properly presented motion to dismiss asserting the defense of qualified immunity. Courts may ask only whether the facts as alleged plausibly state a claim and whether that claim asserts a violation of a clearly established right." *Payne v. Britten*, 749 F.3d 697, 702 (8th Cir. 2014) (reversing district court's order *sua sponte* converting defendants' motion to dismiss into a motion for summary judgment and remanding with instructions for the district court to decide whether defendants were entitled to qualified immunity on the pleadings under Rule 12(b)(6)).

dismiss, the factual allegations in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must be dismissed if it does not plead "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that the plausibility standard does not require a probability, but asks for more than a sheer possibility that a defendant has acted unlawfully).

For the purposes of a motion to dismiss, the court must "assume that well-pleaded factual allegations in the complaint are true and construe the complaint, and all reasonable inferences arising therefrom, most favorably to the pleader." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) (internal quotation marks omitted). The court will not, however, "blindly accept the legal conclusions drawn by the pleader from the facts." *Id.* "When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, the complaint should be dismissed for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*." *Hawkins Constr. Co. v. Peterson Contractors, Inc.*, 970 F. Supp. 2d 945, 949 (D. Neb. 2013).

While a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). "The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)).

### 1. Search and Seizure (Counts 2 and 3)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady v. North Carolina*, 135 S. Ct. 1368, 1371 (2015).

Plaintiffs emphasize Chief Spencer's and Sheriff Jenson's alleged unlawful purpose in searching NCJIS, but Defendants' motions to dismiss instead concern the issue of whether Plaintiffs had a reasonable expectation of privacy in any information about them that was stored on the electronic system. "[T]he subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment." *Bond v. United States*, 529 U.S. 334, 339, n. 2 (2000).

Plaintiffs allege that "[t]he Nebraska Criminal Justice Information System (NCJIS) is [a] criminal justice information system/data base owned and operated by the State of Nebraska for authorized state and local criminal justice users for legitimate purposes involving criminal investigations and the administration of justice. NCJIS is operated, regulated and overseen by the Nebraska Crime Commission, an agency of the State of Nebraska." (Amended Complaint, ¶ 16) Attached as exhibits to the Amended Complaint are copies of memoranda of understanding ("MOUs") the Commission's CJIS Advisory Committee entered into with the Scottsbluff Police Department and Cheyenne County. (Amended Complaint, ¶¶ 17, 18) These MOUs state that "[e]xamples of NCJIS's available data systems and supplying agencies include the State Probation Administration / NPMIS, the State Patrol / Patrol Criminal History, the Department of Correctional Services / Corrections Tracking System, and the Nebraska Commission on Criminal Justice and Law Enforcement (Crime Commission, Jail Standards Board) / Jail Bookings." (Amended Complaint, Ex. A, B)

-15-

Also attached as exhibits to the Amended Complaint are redacted copies of auditing reports, dated August 12, 2017, which provide certain details of the NCJIS searches that allegedly were performed by Spencer and Jenson (Amended Complaint, Ex. C, D, E). These reports do not show any search results, and Plaintiffs do not allege with any particularity what information concerning them was accessed by Defendants. It is merely alleged that "Spencer obtained non-public and highly personal, intimate, and confidential information on Humaran" and "Jenson obtained non-public and highly personal and private information on Stramm [*sic*] ... including but not limited to HHS HIPAA protected information regarding her family members." (Amended Complaint, ¶¶ 23, 32)

Stamm lacks standing to assert a Fourth Amendment claim with respect to "HHS HIPAA protected information regarding her family members" that Jenson allegedly accessed. *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) ("Fourth Amendment rights are personal rights which ... may not be vicariously asserted.") (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). And with respect to any information pertaining directly to Stamm or Humaran that Jenson or Spencer accessed on NCJIS, Plaintiffs' claims fail as a matter of law because their allegations do not contain sufficient facts to show that they had a reasonable expectation of privacy in such electronically stored information.

Generally speaking, "[a]ccessing stored records in a database legitimately acquired is not a search in the context of the Fourth Amendment because there is no reasonable expectation of privacy in that information." *United States v. Muhtorov*, 187 F. Supp. 3d 1240, 1256 (D. Colo. 2015); *see Hallstein v. City of Hermosa Beach*, 87 F. App'x 17, 19 (9th Cir. 2003) (Because plaintiff "does not claim that the data stored in the DMV and police department databases were acquired by those institutions in violation of his Fourth Amendment rights, he cannot complain under the Fourth Amendment about access to that information by others."); *Potocnik v. Carlson*, 9 F. Supp. 3d 981, 997 (D. Minn. 2014) ("No court has ever held that accessing a driver's-license database constitutes a search or seizure within the meaning of the Fourth

Amendment."); *Jones v. Buckner*, 963 F. Supp. 2d 1267, 1277 (N.D. Ala. 2013) (dismissing Fourth Amendment claim because "[a] person does not have a reasonable expectation of privacy in public records such as those accessed through the [National Crime Information Center] database, and searching Plaintiff's records through any such database does not violate the federal constitution."); *Lisenby v. Lear*, No. 5:09-CV-410 DCN, 2013 WL 3762953, at *3 (D. S.C. July 16, 2013) (plaintiff's expectation of privacy DMV records was not objectively justifiable), *aff'd*, 563 F. App'x 240 (4th Cir. 2014); *United States v. Cobb*, No. 3:12-CR-53, 2012 WL 7150434, at *8-9 (E.D. Tenn. Dec. 27, 2012) ("Many courts have held that computer database searches are not subject to Fourth Amendment analysis.") (citing cases), *report and recommendation adopted sub nom. United States v. Campbell*, No. 3:12-CR-53, 2013 WL 596060 (E.D. Tenn. Feb. 14, 2013); *United States v. Ellison*, 462 F.3d 557, 562 (6th Cir. 2006) (finding no expectation of privacy in an officer's search of the Law Enforcement Information Network, which revealed an outstanding warrant); *Phillips v. Bailey*, 337 F. Supp. 2d 804, 806 (W.D. Va. 2004) ("An individual's criminal record is a matter of public record. Certainly, there is no question that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record. DMV records, in some respects, are akin to criminal records maintained by courts and law enforcement agencies.") (internal quotation and citation omitted).

Plaintiffs do not cite any contrary authority, but instead rely on administrative regulations that govern the use of NCJIS. *See* 28 C.F.R. Ch. 1, Pt. 20, Subpt. B; Neb. Admin. R. & Regs. Tit. 78, Ch. 3.[11] "Title 42 U.S.C. § 1983 is not concerned with mere violations of state law." *Sigler v. Lowrie*, 404 F.2d 659, 662 (8th Cir. 1968). The

_____

[11] Plaintiffs also rely on two criminal statutes Neb. Rev. Stat. § 28-924 (erroneously cited in Filing No. 37 at CM/ECF p. 5 as § 29-924) and Neb. Rev. Stat. § 28-925, neither of which provide a private right of action. In any event, Defendants' alleged violations of these statutes are no longer at issue because Plaintiffs have voluntarily dismissed Counts 8 and 9 of their Amended Complaint. *See* Discussion Section II.A, *supra*.

court also has not found any persuasive authority to establish a Fourth Amendment violation. Thus, even if Plaintiffs might be able to advance a non-frivolous argument that they had a reasonable expectation of privacy in information stored on NCJIS, Sheriff Jenson and Chief Spencer are entitled to qualified immunity[12] because there was no clearly established law to alert the officers that their allegedly unlawful searches would deprive Plaintiffs of their Fourth Amendment rights.[13]

"To avoid qualified immunity, the asserted rights must have been clearly established at the time as *constitutional* rights, and not just as rights arising under the common law, administrative regulations, or even codified statutes." *Johnson v. Grob*, 928 F. Supp. 889, 909 (W.D. Mo. 1996) (emphasis in original). "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984).

"Qualified immunity is not a defense available to governmental entities, but only to government employees sued in their individual capacity." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

[12] The defense of qualified immunity is specifically raised in the motion to dismiss filed by Sheriffs Jenson and Overman (Filing No. 25), and is argued in their supporting brief (Filing No. 26). Chief Spencer does not specifically raise or argue the defense of qualified immunity, but does "concur with and adopt the arguments set forth by the County Defendants" (Filing No. 28 at CM/ECF p. 3).

[13] In order to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While prior cases need not have expressly determined that the action in question is unlawful, "in the light of pre-existing law the unlawfulness must be apparent." *Id.* Reciting an abstract right at a high level of generality will not suffice. *Id.* at 639-40.

which a reasonable person would have known. Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks and citations omitted).

"Determining the question of qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Santiago v. Blair*, 707 F.3d 984, 989 (8th Cir. 2013). Courts may address either prong of the analysis first, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and "the defendants are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012). A Rule 12(b)(6) dismissal based on qualified immunity is appropriate when the immunity is established on the face of the complaint. *Dornheim v. Sholes*, 430 F.3d 919, 926 (8th Cir. 2005). As discussed above, that is the situation here. Both prongs of the qualified immunity analysis are satisfied in this instance.

The finding that Plaintiffs' allegations are not sufficient to show a Fourth Amendment violation by Sheriff Jenson and Chief Spencer also means that no actionable claim is stated against the County of Cheyenne or the City of Scottsbluff. *See Eagle v. Morgan*, 88 F.3d 620, 628 (8th Cir. 1996) (court's decision that police officers' conduct did not violate plaintiff's constitutional right to privacy also disposed of plaintiff's related claims against the city that employed the officers); *Roach v. City of Fredericktown*, 882 F.2d 294, 298 (8th Cir.1989) (emphasizing that city cannot be liable for failure to train unless there has been "an underlying violation of the plaintiff's constitutional rights by a municipal employee").

Finally, Plaintiffs' allegations against the County of Cheyenne and the City of Scottsbluff fail to state a claim upon which relief can be granted for the additional reason that under § 1983, local governments are responsible only for "their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)* (emphasis in original)). They are not vicariously liable under § 1983 for their employees' actions. *Id.* That is to say, a municipality or other local government may be liable under § 1983 only if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation.

Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Id.* (quoting *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691 (1978)). Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. *Id.* at 61. These are "action[s] for which the municipality is actually responsible." *Id.* (quoting *Pembaur*, 475 U. S. at 479-80).

An official policy involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy. *Jane Doe A By and Through Jane Doe B v. Special School Dist. of St. Louis County*, 901 F.2d 642, 645 (8th Cir. 1990) (citing *Pembaur*, 475 U.S. at 483). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur, 475 U.S. at 481*. Plaintiffs allege upon information and belief that Jenson's and Spencer's "'edicts and acts' fairly represent the official policy and custom" of their respective jurisdictions (Amended Complaint, ¶¶ 4, 6), but, even accepting this as true, Plaintiffs' allegations do not establish that Jenson's or Spencer's actions violated their Fourth Amendment rights.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's [or county's] culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton v. Harris,* 489 U.S. 378, 388 (1989)). "Only then can such a shortcoming be properly thought of as a city [or county] 'policy or custom' that is actionable under § 1983." *Id.* (quoting *Canton,* 489 U.S. at 389) (internal quotation marks omitted). Plaintiffs, however, have failed to provide a plausible factual basis for concluding that the City of Scottsbluff or the County of Cheyenne may be liable for the Fourth Amendment claims alleged in the Amended Complaint based on a failure to train.[14]

In summary, the Fourth Amendment "search and seizure" claims alleged by Stamm against Sheriff Jenson in his individual capacity, and by Humaran against Chief Spencer in his individual capacity, will be dismissed based on the doctrine of qualified immunity. Stamm's claim brought against Cheyenne County and Sheriff Jenson in his official capacity, and Humaran's claim brought against the City of Scottbluff and Chief Spencer in his official capacity, will be dismissed because the facts alleged are not sufficient to create a plausible inference that Plaintiffs were deprived of their Fourth Amendment rights. No Fourth Amendment claim is alleged against Sheriff Overman or Scotts Bluff County.

---

[14] This is true of all claims alleged against the City of Scottsbluff, Cheyenne County, and Scotts Bluff County. Plaintiffs merely allege in conclusory fashion that "policies and customs" of these local governments "resulted in constitutional and statutory deprivation of the rights of the Plaintiffs." (Amended Complaint, ¶¶ 5, 7, 9).

### 2. Right to Privacy (Count 1)

Although the Constitution does not explicitly mention any right of privacy, the Supreme Court has recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Carey v. Population Servs., Int'l*, 431 U.S. 678, 684 (1977) (quoting *Roe v. Wade*, 410 U.S. 113, 152 (1973)). "One aspect of this right to privacy encompasses an individual's interest in avoiding disclosure of personal matters and has been characterized as the right to confidentiality." *Riley v. St. Louis Cty.*, 153 F.3d 627, 631 (8th Cir. 1998).[15]

> This protection against public dissemination of information is limited and extends only to highly personal matters representing "the most intimate aspects of human affairs." *Wade v. Goodwin*, 843 F.2d 1150, 1153 (8th Cir.), *cert. denied*, 488 U.S. 854, 109 S.Ct. 142, 102 L.Ed.2d 114 (1988). "[T]o violate [a person's] constitutional right of privacy the information disclosed must be either a shocking degradation or an egregious humiliation of her to further some specific state interest, or a flagrant bre[a]ch of a pledge of confidentiality which was instrumental in obtaining the personal information." *Alexander v. Peffer*, 993 F.2d 1348, 1350 (8th Cir.1993). To determine whether a particular disclosure satisfies this exacting standard, we must examine the nature of the material opened to public view to assess whether the person had a legitimate expectation that the information would remain confidential while in the state's possession. *Sheets v. Salt Lake County*, 45 F.3d 1383, 1387-88 (10th Cir.), *cert. denied*, 516 U.S. 817, 116 S.Ct. 74, 133 L.Ed.2d 34 (1995); *see also Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 457-58, 97 S.Ct. 2777, 2797–98, 53 L.Ed.2d 867 (1977) (suggesting that an individual's legitimate expectation of privacy plays a pivotal role in this constitutional analysis). "When the information is inherently private, it is entitled to protection." *Fraternal Order of Police, Lodge 5 v. City of Philadelphia*, 812 F.2d 105, 116 (3d Cir.1987).

---

[15] For purposes of analyzing the individual Defendants' qualified immunity defense, the court finds this right to confidentiality was clearly established at the time of their alleged misconduct.

*Eagle*, 88 F.3d at 625 (also observing that "courts have traditionally been reluctant to expand this branch of privacy beyond those categories of data which, by any estimation, must be considered extremely personal.").

The fact situation presented in *Eagle* is very similar to what is alleged by Plaintiffs in the present case:

> In 1987, Wayne Ridout, a businessman from Searcy, Arkansas, informed local authorities that David Eagle had stolen enough lumber from Ridout's store to partially construct a new two-story home. Following a police investigation into the complaint, Eagle pleaded guilty in an Arkansas trial court to felony theft of property. Eagle had no prior criminal record and entered his plea pursuant to an enactment that allows Arkansas judges to indefinitely defer further proceedings and place first time felons on a tentative term of probation. If the defendant violates the requirements of his probation, the judge may declare him guilty and impose the punishment otherwise provided by law. On the other hand, the statute directs the court to dismiss the case and expunge the defendant's record if he "fulfill[s] ... the terms and conditions of probation or [is] release[d] by the court prior to the termination period thereof." Moreover, these measures occur "without court adjudication of guilt."

> The trial court accepted Eagle's plea and required him to spend forty-five days in the county jail, serve six years probation, and pay $25,000 in restitution .... Approximately three years later, a state judge terminated Eagle's probation and entered an order expunging his criminal record. The expungement decree expressly provided that it "restored [Eagle] to [his] civil and constitutional rights as if [the felony theft of property] had never been committed," and as a matter of law it "completely exonerate[d] [Eagle] of any criminal purpose." Additionally, the state legislature has decreed that an expunged record should be treated as confidential and released only to the individual whose record was expunged and, in certain circumstances, to judicial or law enforcement personnel.

After the state court struck the felony theft of property from Eagle's record, he began working as an auditor for the City. In the course of his employment, Eagle performed an audit of certain Jonesboro Police Department ("JPD") records and conducted a police salary survey to determine whether local officers were receiving competitive wages. The fruits of Eagle's labor, however, apparently displeased some law enforcement workers; several curious officers accessed the National Crime Information Center ("NCIC") and the Arkansas Crime Information Center ("ACIC") computer systems in an effort to confirm rumors that Eagle had a felony record. State guidelines governing the use of the ACIC system dictate that the computer network should, as relevant here, only be available to "criminal justice agencies in their official capacity,"and the pertinent federal provision restricts NCIC access to "criminal justice agencies for criminal justice purposes[.]" Despite these restrictions, JPD was not carrying on an official investigation of Eagle's criminal activity at the time the officers in this case made their inquiries. Further, because the responsible authorities had failed to file notification of the expungement of Eagle's record, the report obtained by the officers did not indicate that the listed felony offense had been stricken.

This information regarding Eagle's criminal history was for some time also available from at least one other source. Before receiving belated notice that the felony had been removed from Eagle's record, the Arkansas State Police, in response to requests made pursuant to the Arkansas Freedom of Information Act, released to certain members of the public, including at least four reporters, unaltered copies of Eagle's criminal case file.

On August 16, 1993, in an admitted effort to "throw doubt on [Eagle's police salary] survey results," appellant Rohnny McDaniel at a Jonesboro City Council meeting revealed the auditor's criminal history by publicly reading the following excerpt from Eagle's case file:

> At approximately 6:00 p.m. on Thursday, January 15, 1987, an investigator met with the Deputy Prosecuting Attorney and was advised that he had received information of a possible theft of materials from Ridout Lumber Company. According to the Deputy Prosecutor, it was believed that David Eagle had stolen building materials. On March 5,

1987, David Eagle pled guilty to one count of 41-2203, theft of property.

Interestingly, McDaniel is the only individual appellant who did not personally access the NCIC/ACIC computer systems to verify the rumors about Eagle, but Eagle maintains that McDaniel gained his knowledge through the efforts of his police colleagues.

Eagle subsequently initiated this action against sundry JPD officers, individually and in their official capacities, and the City. Eagle asserts that the individual state actors violated his constitutional right to privacy when they conducted unjustified searches on the ACIC/NCIC computer databases and by causing the public disclosure of information about his expunged criminal record. Also, he contends that the City is liable because these constitutional violations were a result of the municipality's failure to properly train its employees in the use of the computer networks and because the alleged invasion of privacy occurred pursuant to an official custom or policy.

*Id.* at 622-23 (statutory and regulatory citations omitted).

The Eighth Circuit determined that the disclosure of Eagle's criminal history did not infringe upon his right to confidentiality because "[f]ar from being 'inherently private,' the details of Eagle's prior guilty plea are by their very nature matters within the public domain." *Id.* at 625. While troubled by the officers' conduct in accessing Eagle's criminal record from the NCIC and ACIC computer networks, the Court of Appeals also determined that their searches did not violate Eagle's constitutional right to privacy. The Court stated:

[W]e must not forget the type of database accessed in this case. Eagle has alleged that the officers used the ACIC and NCIC systems to search his criminal history files. Regulations on the use of these computer networks provide that criminal history information includes "identifiable descriptions and notations of arrests, detentions, indictments, informations, or other formal criminal charges, and any disposition arising therefrom, sentencing, correctional supervision, and release."

Additionally, the Department of Justice has stated that criminal history information in the NCIC does not include "[i]ntelligence or investigative information (*e.g.*, suspected criminal activity, associates, hangouts, financial information, ownership of property and vehicles)."

As we have discussed earlier in this opinion, the type of information contained within these criminal history files is not the sort of data over which an individual can successfully assert a right to privacy. *See, e.g.*, [*Nilson v. Layton City*, 45 F.3d 369, 372 (10th Cir. 1995)] ("Criminal activity is ... not protected by the right to privacy."). Because Eagle has no legitimate expectation of privacy in the contents of his criminal history file, we cannot agree that the officers violated his constitutional right when they engaged in an unwarranted search of this material.

*Id.* at 627-28 (regulatory citations omitted); *see also McCaslin v. Campbell*, 108 F.3d 1382, 1997 WL 148824, at *1-2 (8th Cir. Apr. 2, 1997) (unpublished) (affirming dismissal of constitutional privacy claim alleging release of plaintiff's social security number, bank account numbers, driver's license information, previous landlords, personal references, previous criminal record, and previous names because such information was either a matter of public record or else did not involve "the most intimate aspects of human affairs").

Plaintiffs attempt to distinguish *Eagle* by arguing that they "are not claiming a violation of their right to privacy/right to confidentiality based on dissemination of public guilty pleas." (Filing No. 31 at CM/ECF p. 8) Instead, they say, their claims "involve the procurement and disclosure of non-public, highly personal, intimate, and confidential information, including, HHS HIPPA [*sic*] protected information regarding family members" as alleged in paragraphs 23 and 32 of the Amended Complaint. (*Id.*) Such allegations are ineffectual legal conclusions. *See Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997) (in analyzing a motion to dismiss, the court should accept plaintiff's factual allegations as true, but should reject conclusory allegations of law and unwarranted inferences). Also, as already discussed with reference to the alleged "HHS HIPPA [*sic*] protected information," a plaintiff "cannot rest his claim to relief

on the legal rights or interests of third parties." *Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)). Absent any supporting factual allegations to show that Plaintiffs had a legitimate expectation that any NCJIS data concerning them would remain confidential, Plaintiffs' right-to-privacy claim necessarily fails.

In addition, the facts alleged do not show that the alleged searches resulted in the disclosure of any information. It is merely alleged "upon information and belief" that "Defendant Spencer unlawfully disseminated the illegally obtained NCJIS information relating to Humaran to the other individually named defendants, and employees or officials of the defendant political subdivisions, and possibly to other members of the WING group," and, more generally, that "Defendants unlawfully disseminated the illegally obtained NCJIS information on the Plaintiffs to each other and possibly other members of the WING group." (Amended Complaint, ¶¶ 25, 33)

"[A]llegations 'upon information and belief' may state a claim after *Iqbal* and *Twombly,* [but] a claim must still be based on factual content that makes liability plausible, and not be formulaic recitations of the elements of a cause of action." *Klohs v. Wells Fargo Bank, NA,* 901 F.Supp.2d 1253, 1259 n. 2 (D.Haw.2012) (internal quotation marks omitted). "'Information and belief' does not mean pure speculation." *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 44 (1st Cir. 2012) (quoted with approval in *Pope v. Fed. Home Loan Mortg. Corp.*, 561 F. App'x 569, 573 (8th Cir. 2014) (unpublished)). "When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are 'based on secondhand information that [he] believes to be true.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.,* 631 F.3d 436, 442 (7th Cir. 2011) (quoting Black's Law Dictionary 783 (7th ed.1999)). "Conclusory allegations that lack factual support and are based solely on 'information and belief' do not satisfy the federal pleading standards." *Montero v. Bank of Am., N.A.*, No. 13-CV-850 SRN/JSM, 2014 WL 562506, at *4 (D. Minn. Feb. 13, 2014) (citing *Cheng Lee v. Fed. Nat'l Mortg. Ass'n,* No. 13-2460,

2014 WL 503168, at *2 (8th Cir. Feb. 10, 2014) (unpublished); *Richter v. Fed. Nat'l Mortg. Ass'n,* No. 13-2524, 2014 WL 503176, at *1 (8th Cir. Feb. 10, 2014) (unpublished)).[16]

To the extent Plaintiffs may be attempting to assert that any Defendant violated their right to privacy by receiving confidential information from others, they have produced no cogent legal authority to establish that such receipt was unlawful. Also, as discussed above, Plaintiffs' allegations regarding dissemination of any information obtained from NCJIS are highly speculative and do not meet the "plausibility" test.

Stamm alleges that "Defendants Overman and Spencer filed written frivolous complaints with the Attorney General's office regarding private [F]acebook posts made by Stamm on her personal [F]acebook page (which involved matters of constitutionally protected free speech; to-wit: use of medicinal marijuana)," and, "[u]pon information and belief," that "none of the Defendants had lawful access to Stamm's Facebook posts." (Amended Complaint, ¶ 27) Stamm's Facebook posts are not the sort of "highly personal" information that may be subject to protection under the Due Process Clause.[17] Stamm additionally alleges "[u]pon information and belief"

---

[16] "The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and citations omitted), but Plaintiffs' allegations are not sufficient to show that either situation exists here.

[17] Stamm's allegation that her Facebook posts were protected speech under the First Amendment also undercuts her claim that she had an expectation of privacy regarding her views on marijuana. "[T]he plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy." *Fletcher v. Price Chopper Foods of Trumann, Inc.,* 220 F.3d 871, 877 (8th Cir. 2000) (finding plaintiff had no expectation of privacy where she informed co-workers of her medical condition) (quoting *Hill v. National Collegiate Athletic*

that "one or more of the Defendants used unlawful means to obtain her private cellular telephone number." (Amended Complaint, ¶ 30) A telephone number is not "highly personal information," and, in any event, her allegation that someone used unlawful means to obtain the number is pure speculation.

Finally, it must be noted that in Count 1, as well as in Counts 4 and 5, it claimed that "Defendants have violated Plaintiffs' constitutional and statutory right[s] ...." (Amended Complaint, ¶¶ 43, 52, 55) This, of course, is merely a conclusion of law. The Amended Complaint is structured such that the operative facts are alleged in the first part of the pleading (paragraphs 2 through 42), and then all of these allegations are incorporated by referenced into the ten counts that are set forth at the end of the Amended Complaint (paragraphs 43 though 72). Each count merely states a theory of recovery and a claim for damages.

Because this case involves multiple Plaintiffs and Defendants, and different transactions or occurrences, this form of pleading does not strictly comply with Rule 10(b) of the Federal Rules of Civil Procedure, which provides that "[a] party must state its claims or defenses in numbered paragraphs, each limited so far as practicable to a single set of circumstances." For example, in Count 1, the alleged invasion of privacy involves at least three separate sets of circumstances: (1) Spencer accessing Humaran's NCJIS information; (2) Jenson accessing Stamm's NCJIS information; and (3) Overman and Spencer obtaining Stamm's Facebook posting. Humaran and Stamm cannot assert a claim for a violation of the other's privacy, nor can Jenson, Overman, and Spencer be held liable for each other's actions.[18]

_____

_Ass'n_, 865 P.2d 633, 648 (Cal. 1994)).

[18] "As a general rule, a plaintiff may only assert his own injury in fact and 'cannot rest his claim to relief on the legal rights or interests of third parties.'" _Hodak_, 535 F.3d at 904 (quoting _Warth_, 422 U.S. at 498-99). Also, "[t]o prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation. _White v. Jackson_, 865 F.3d 1064, 1081 (8th Cir. 2017).

Despite this pleading problem, the court believes the Amended Complaint is understandable because the factual allegations are set out in separate numbered paragraphs that are limited to a single set of circumstances. *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1324 (3d ed. 2011) ("Common sense suggests that a district court should have discretion to order separation when there is a possibility of confusion and to follow the text of the rule and not order separation when the existing pleading is comprehensible."). And, more importantly, because the facts alleged fail to state a claim upon which relief can be granted against any Defendant, there is no need to require Plaintiffs to separate their claims in order to conform to Rule 10(b).

In summary, the Fourteenth Amendment "right to privacy" claims alleged by Plaintiffs against Sheriff Jenson, Chief Spencer, and Sheriff Overman in their individual capacities will be dismissed based on the doctrine of qualified immunity. Plaintiffs' claim brought against these Defendants in their official capacities, and against Cheyenne County, the City of Scottbluff, and Scotts Bluff County will be dismissed because the facts alleged are not sufficient to create a plausible inference that Plaintiffs were deprived of their Fourteenth Amendment "privacy" rights.

### 3. Liberty Interest (Count 5)

Plaintiffs claim that Defendants violated their "constitutional right to liberty" under the Fourteenth Amendment (Amended Complaint, ¶ 25), but they allege no facts to support such a claim. Plaintiffs also fail to provide any supporting legal authority in their briefs. Stamm merely asserts that "Defendants violated Plaintiffs' liberty rights when they violated the Plaintiffs' right to privacy/confidentiality, Fourth Amendment right against unlawful search and seizure, denial of equal protection, by conspiring against the Plaintiffs and violated Stamm's First Amendment rights to free speech." (Filing No. 31 at CM/ECF p. 15)

To state a claim under the Due Process Clause, some interest must first be violated. *See Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir.1999). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." [*Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).] In most cases, substantive due process violations involve "marriage, family, procreation, and the right to bodily integrity." *Singleton*, 176 F.3d at 425 (quoting *Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)). More generally, the Supreme Court has held that substantive due process "protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty.' " *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)).

*Saylor v. Nebraska*, 812 F.3d 637, 646 (8th Cir. 2016).

To the extent Plaintiffs may be claiming that Defendants interfered with their employment at the Nebraska Crime Commission, the Eighth Circuit has held that "[o]ccupational liberty ... is not protected by substantive due process." *Singleton v. Cecil*, 176 F.3d 419, 428 (8th Cir. 1999) (en banc) (quoting *Zorzi v. County of Putnam*, 30 F.3d 885, 895 (7th Cir.1994)). In any event, it is not alleged that any such interference resulted in any injury to Plaintiffs. "A person's reputation, alone, is not a protected liberty or property interest." *Steckelberg v. Rice*, 184 F. Supp. 3d 746, 755 (D. Neb. 2016), *aff'd*, 878 F.3d 630 (8th Cir. 2017).

In summary, the Fourteenth Amendment "liberty interest" claims alleged by Plaintiffs against Sheriff Jenson, Chief Spencer, and Sheriff Overman in their individual capacities will be dismissed based on the doctrine of qualified immunity. Plaintiffs' claim brought against these Defendants in their official capacities, and against Cheyenne County, the City of Scottsbluff, and Scotts Bluff County will be dismissed because the facts alleged are not sufficient to create a plausible inference that Plaintiffs were deprived of their Fourteenth Amendment "liberty" rights.

### 4. Freedom of Speech (Count 10)

Stamm argues that she has sufficiently alleged a First Amendment retaliation claim because "frivolous calls and written complaints by Defendants Overman and Spencer" to the Nebraska Attorney General about her Facebook posts in favor of legalizing medicinal marijuana resulted in her being "directed by her boss and the Assistant Attorney General to delete the posts." (Filing No. 31 at CM/ECF p. 19)

To establish a First Amendment retaliation claim in a particular case, a plaintiff must show (1) that she engaged in a protected activity, (2) that the defendant's actions caused an injury to the plaintiffs that would chill a person of ordinary firmness from continuing to engage in the activity, and (3) that a causal connection exists between the retaliatory animus and the injury. *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070 (8th Cir. 2017). Defendants do not dispute that Plaintiffs' Facebook posts were protected speech, but they contend Plaintiff has not alleged sufficient facts to establish the second and third elements.

"Two types of actual injury give rise to First Amendment standing. The first is the injury caused by the threat that the speaker will be prosecuted or otherwise punished for his or her speech. . . . A second injury-in-fact occurs when a plaintiff foregoes expression in order to avoid a sanction or penalty." *Parow v. Kinnon*, 300 F. Supp. 2d 256, 261-62 (D. Mass. 2004). Stamm alleges she deleted her Facebook posts after being directed to do so by her supervisor, who told her that an Assistant Attorney General also wanted the posts deleted (Amended Complaint, ¶ 29). Although not expressly alleged, it is reasonable to infer that Stamm deleted the posts in order to avoid possible adverse employment action. This may constitute a sufficient injury for First Amendment purposes.[19]

---

[19] Whether Plaintiff's employer was justified in directing her to take down the Facebook posts is a separate issue, one which will not be addressed here.

However, for an actionable claim to exist, the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976). Defendants are not alleged to have had any control over Stamm's supervisor or the Assistant Attorney General.

While Defendants[20] are alleged to have "fil[ed] written complaints and ma[de] numerous telephone calls criticizing Stamm's protected speech with the Attorney General's office" (Amended Complaint, ¶ 28), such criticism was not unlawful. Stamm alleges on information and belief that "one or more of the Defendants made ... harassing, threatening and intimidating calls" to her personal phone and office phone (Amended Complaint, ¶ 30), but, on the facts alleged, those calls do not appear to have been made in retaliation for her Facebook posts. Similarly, there does not appear to be any causal connection between Stamm's Facebook posts and the search that Jenson allegedly ran on NCJIS.

In summary, Stamm's First Amendment retaliation claim alleged against all Defendants will be dismissed because the facts alleged are not sufficient to establish a plausible inference that there is a causal connection between the actions of any Defendant and the alleged injuries.

### 3. Equal Protection (Count 4)

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated

---

[20] This allegation is made against all Defendants, but it is not alleged that Sheriff Jenson (or Cheyenne County) had any involvement in making complaints to the Attorney General's office.

alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Henry v. Metropolitan Sewer Dist.*, 922 F.2d 332, 341 (6th Cir.1990) (quoting *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir.1989) (en banc))

A plaintiff need not plead facts establishing a prima facie case of discrimination under *McDonnell Douglas*[21] in order to defeat a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002). However, she must allege facts sufficient to "raise a right to relief above the speculative level." *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1014 (8th Cir. 2013) (quoting *Twombly*, 550 U.S. at 555). In *Hager*, the Eighth Circuit reversed the district court's denial of the defendant's motion to dismiss a § 1983 equal protection claim where the plaintiff alleged conclusions that she was "a victim of gender discrimination" and "was discharged under circumstances summarily [sic] situated nondisabled males ... were not." She did "not allege any gender-related comments or conduct before her termination" or any "facts showing that similarly situated employees were treated differently." *Id.* The Eighth Circuit stated that the plaintiff's "allegation that she is the victim of gender discrimination fails to give [the defendant] fair notice of the claim and the grounds upon which it rests," and her "conclusory assertion that she was discharged under circumstances similarly situated men were not imports legal language couched as a factual allegation and fails to raise a right to relief above the speculative level." *Id.*

In the present case, Plaintiffs allege that "[m]ale members of the Nebraska Crime Commission, including Darrell Fisher and others, as well as Richard Wiener, who worked with the Defendants on their unsuccessful grant application, and male members of the Crime Commission who voted to deny the WING grant were not subjected to unlawful NCJIS searches or the other unlawful actions." (Amended Complaint, ¶ 35) However, Plaintiffs do not allege that they were similarly situated

---

[21] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

to either of these groups of men.[22] Plaintiffs are not "members" of the Commission, and they do not claim either to have "worked with Defendants on their unsuccessful grant application" or to have "voted to deny the WING grant." Plaintiffs also do not allege any gender-related comments or conduct. The complaints Defendants Overman and Spencer allegedly made about Plaintiff Stamm's Facebook posts regarding medical marijuana and the harassing phone calls she allegedly received about being a "cop hater" and "putting dead babies in the highway" appear gender-neutral. It is sheer speculation to conclude that Plaintiffs were subjected to alleged unlawful activity because they are female.

In summary, the Fourteenth Amendment equal protections claims alleged by Plaintiffs against Sheriff Jenson, Chief Spencer, and Sheriff Overman in their individual capacities will be dismissed based on the doctrine of qualified immunity. Plaintiffs' claim brought against these Defendants in their official capacities, and against Cheyenne County, the City of Scottbluff, and Scotts Bluff County will be dismissed because the facts alleged are not sufficient to create a plausible inference that Plaintiffs were deprived of equal protection.

### 6. Conspiracy (Counts 6 and 7)

To establish a conspiracy to violate a plaintiff's civil rights in breach of 42 U.S.C. § 1985(3), a plaintiff must prove: "(1) the existence of a civil conspiracy; (2) that the purpose of the conspiracy was to deprive her either directly or indirectly of her civil rights; (3) that a conspirator did an act in furtherance of the object of the conspiracy; and (4) damages, shown by demonstrating either injury to person or

---

[22] Plaintiffs state in their brief that "[i]f the Court deems that the factual allegations must include the words "similarly situated" and the specific factual allegations currently pled are insufficient, Plaintiffs respectfully request leave to add the words "similarly situated" to paragraph 35 of the First Amended Complaint" (Filing No. 31 at CM/ECF p. 14). Plaintiffs' request will be denied because such an amendment would not cure the pleading deficiency. *See Hager*, 735 F.3d at 1014.

property or the deprivation of a civil right." *Mettler v. Whitledge*, 165 F.3d 1197, 1206 (8th Cir. 1999). "The language [in § 1985(3)] requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). "Speculation and conjecture are not enough to prove a conspiracy exists." *Mettler*, 165 F.3d at 1206. As discussed in the preceding section, the facts alleged in the Amended Complaint are not sufficient to create an inference that Defendants were motivated to act because of Plaintiffs' gender.

"To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (citing *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). "The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Id.* Plaintiffs' § 1983 conspiracy claim necessarily fails because their Amended Complaint fails alleged facts sufficient to show that Plaintiffs were deprived of a constitutional right.

In addition, to sustain a conspiracy claim under either §1983 or §1985, a plaintiff must allege with particularity specific facts indicating a "meeting of the minds," meaning a mutual understanding among the alleged conspirators to take actions to an unconstitutional end. *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675 (8th Cir. 2012). Here, Plaintiffs only state the "formulaic" legal elements of a conspiracy claim. None of their specific factual allegations point to or suggest a "meeting of the minds" amongst the Defendants, as opposed to discrete, individual alleged acts by them not done in concert.

In summary, the § 1983 conspiracy claim alleged by Plaintiffs against all Defendants will be dismissed because the facts alleged are not sufficient to create a

plausible inference that Plaintiffs were deprived of any rights under the United States Constitution, or that there was a "meeting of the minds." The § 1985 conspiracy claim alleged by Plaintiffs against all Defendants will be dismissed because the facts alleged are not sufficient to create a plausible inference that Defendants acted with discriminatory animus or that there was a "meeting of the minds."

## III. CONCLUSION

While Plaintiffs' allegations may sufficiently indicate that Defendants Jenson and Spencer violated Nebraska law by accessing information about Plaintiffs on the NCJIS database (as alleged in Counts 8 and 9 of the Amended Complaint, which claims are being dismissed on Plaintiffs' motion), they are not sufficient to state a plausible claim for relief under 42 U.S.C. §§ 1983 and 1985 against any Defendant for alleged constitutional violations or civil rights conspiracies.

IT IS ORDERED:

1.  Plaintiffs' Motion to Dismiss (Filing No. 33) is granted, and Counts 8 and 9 of Plaintiffs' Amended Complaint (Filing No. 24) are dismissed without prejudice.

2.  To the extent that Counts 1, 2, 3, 4, 5, 6, and 10 of Plaintiffs' Amended Complaint rest upon alleged violations of the Nebraska Constitution or Nebraska statutes, all such state-law claims are dismissed without prejudice.

3.  Plaintiffs' Motion to File Evidence Under Restricted Access (Filing No. 39) is denied.

4.    Defendants' Motions to Dismiss (Filing Nos. 25, 27) are granted and, except as specified in paragraphs 1 and 2 above, Plaintiffs' claims are dismissed with prejudice.

5.    Judgment will be entered by separate document and the clerk of the court will proceed to close the file for statistical purposes.

DATED this 11th day of June, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge